UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| SARAH BYRD, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 19-315-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| FRANK BRYANT, individually and in his | ) | **MEMORANDUM OPINION** |
| official capacity as Wolfe County | ) | **AND ORDER** |
| Constable, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This case involves a property dispute among neighbors that was anything but neighborly. Months of bickering intensified into threats of violence, and Plaintiff Sarah Byrd ended up being charged with terroristic threatening. Byrd claims that the arresting officer was in cahoots with her neighbors and, as a result, she was maliciously prosecuted. The matter is pending for consideration of Defendant Frank Bryant's motion for summary judgment. [Record No. 30] The motion will be granted because Bryant had probable cause to initiate the Byrd's prosecution.

## I.

Wolfe County in Eastern Kentucky comprises a portion of the northern end of the Daniel Boone National Forest. Morgan County lies immediately to the northeast. The Wolfe County seat is located in Campton, which is named for the Swift Camp Creek that runs through downtown. One witness observes that Campton is a small community where "pretty much everybody around [is] buddies," and "[e]verybody knows what everybody's doing." [Record

No. 28, p. 21]  Washington Street runs north from Campton along the Creek for nearly a mile before it turns into Harvest Ridge Road.   The street then winds its way around the edge of forest.  Eventually, it leads to the site of the events giving rise to this action.

In 2008, Byrd's father purchased a home at 492 Harvest Ridge Road in Campton. [Record No. 27, p. 4]  The Linkouses originally owned the land on which the house sits.  [*Id.* at p. 31]  At some point many years earlier, the Linkous family conveyed the land but retained an easement in the form of a driveway that allows them to cross the property and access their farm, which borders the back of the Byrds' property.  [*Id.* at pp. 23, 31]  Mike Linkous and his wife Geraldine live "a few houses down" from the Byrds, while Mike's father, Denzil, lives about a mile away.  [*Id.* at p. 23]

Byrd lived on the property on Harvest Ridge until 2011.  She then moved throughout Wolfe and Morgan Counties multiple times before returning with her husband and children sometime in 2017.  [Record No. 27, pp. 2-4]  Throughout this period of nearly ten years, neither the Byrds nor any other residents of the Harvest Ridge property had any disputes with the Linkouses concerning their use of the driveway.  [*Id.* at pp. 22, 75]

The Byrds' and the Linkouses' relationship deteriorated sometime around the beginning of 2018.  Tensions rose when Byrd allegedly caught Mike Linkous "looking in [her] bedroom window" and confronted him about being on her property.  [Record No. 27, p. 22] After that, the Linkouses allegedly began to torment Byrd and her children by habitually sitting on the driveway, walking around the property, and "claim[ing] they owned it."  [*Id.*; Record No. 28, p. 7]  However, when Byrd would voice objections, the Linkouses would respond that it was their property and they would "do as [they] pleased."  [*Id.* at p. 24]  Bickering over the

use and extent of the right-of-way occurred "several times weekly for six months."  [*Id.* at p. 27]

Byrd called the police a "minimum of three" times over the course of the feud, but law enforcement did not intervened.  [Record No. 27, p. 25]  She also contacted the county attorney's office, but no action was taken.  [*Id.* at pp. 28-29]  At some point, the county attorney wrote to the Byrds on behalf of the Linkouses, requesting that they move a vehicle off the right-of-way.  [*Id.* at p. 29; Record No. 28, p. 10]  Apparently, because the Linkouses rarely used the driveway, the Byrds had parked a broken-down truck there for so long that it had "weeds grown up in it."  [Record No. 28, p. 10]  The Byrds moved the truck without objection, but the spat continued.  [Record No. 27, p. 29]

June 22, 2018, proved to be a tipping point.  That evening, Byrd was at home with her children when Mike and Geraldine Linkous drove down the driveway and around to the back of the Byrds' home near the back yard where the children were playing.  [Record No. 27, p. 30]  Mike Linkous exited his truck and began "walking around, just exploring [the Byrds'] yard, looking in the truck bed, and [doing] different things he really had no right to do."  [*Id.*]  Byrd went to the back yard and warned Mike to get back on the right-of-way, at which point the "who-owns-what" argument resumed.  [*Id.*]  This time, however, physical threats were exchanged, allegedly initiated by Mrs. Linkous.  [*See id.* at p. 37; Record Nos. 30-4; 30-5.]

Mrs. Linkous called 9-1-1 first.  [Record No. 30-7, "1 – Linkus [sic] call to 911"]  She reached Corey Centers, the dispatcher on duty.  [*See* Record No. 30-6.]  However, before she could speak, Byrd could be heard saying, "[y]ou better get in that vehicle and get out of my

yard before I shoot your ass."[1]  [*Id.* at 0:20-0:25][2]  Mrs. Linkous then advised Centers that she and her husband came down the driveway to "check on the cows" when a woman came out and threatened to shoot them.  [*Id.* at 0:40-0:45]  When Mrs. Linkous asked Byrd for her name so she could relay it to Centers, Byrd responded that it was "none of [her] damn business." [*Id.* at 1:00-1:05]

Byrd called 9-1-1 next.  [Record No. 30-7, "2 – Sarah Byrd's 911 call"]  She began her call by briefly summarizing the situation:

> My name is Sarah Byrd, I have got Mike Linkous in my yard and he is taking full advantage of what is called a right of way, and he swears . . . that he owns my property, and he does not.  His wife is out here threatening to whip my ass. I've caught this man looking in my bedroom window. I want somebody out here.

[*Id.* at 1:00-1:30]  Byrd went on to tell Centers that

> I'm not [going to] have somebody up here threatening me in front of my children.  I told him you can either use your right of way and get through your fence or leave.  And that big mouthed woman of his jumped out and started threatening me.  I ain't having it, I will shoot [them].  Whoever's coming better get their ass out here [be]cause I've got a gun and I will shoot them.

---

[1]     Byrd half-heartedly disputes that she threatened anyone, but the Court is not required to accept her version of the events because it is blatantly contradicted by the audio files.  *See Scott v. Harris*, 550 U.S. 372, 281 (2007).  When the nonmovant's version of the events and the record "tell[] quite a different story," such that their version of events is "blatantly contradicted by the record, . . . a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id.*  Instead, the Court "adjusts its viewpoint" to the facts "as depicted" by the record.  *Estep v. Combs*, 2020 WL 3270379, at *1 n. 3 (E.D. Ky. June 17, 2020).

[2]     Also, citations to the audio files are referenced from the beginning of the respective recordings, not the beginnings of the calls themselves.

[*Id.* at 4:23-4:45][3]  Byrd then backtracked and reassured Centers that she did not have the gun in her hand, but she quickly affirmed that she would "protect [her] property."  [*Id.* at 4:50-5:00]  When Byrd realized she knew Centers,[4] she doubled down on the threats, saying, "[y]ou know who you're dealing with then, and you know I'm mean as s--t."  [*Id.* at 5:10-5:15]

Centers dispatched Wolfe County Constable Frank Bryant to the scene because "anytime a gun is involved in a situation it has to be investigated."  [Record No. 30-5, p. 1]  An officer with the Wolfe County Sheriff's Department, Michael Caudill, and a Kentucky State Trooper (not identified in the record) were also dispatched, but they arrived well after Bryant.  [*See* Record No. 27, p. 44-46.]

When Bryant arrived, the Linkouses were all on the right-of-way.  Mike and Geraldine were in one vehicle, and Denzil, who Mike had called for help, was in another vehicle parked behind them.  [Record No. 29, p. 11]  Bryant noticed fairly quickly that there was no gun involved, so he proceeded to intervene before the other officers arrived. [*Id.* at p. 16]  It was an "upset scene," with Byrd claiming that the Linkouses had been on her property, and the Linkouses vehemently denying the accusations.  [*Id.* at 11-12]  As the neighbors exchanged obscenities, Bryant made several attempts to diffuse the situation by directing Byrd to remain on her porch.  [*Id.* at 12-13]  But when it began to rain, Bryant got in Denzil Linkous's vehicle to stay out of the rain and talk about "what [was] going on."  [Record Nos. 29, p. 13; 28, pp. 16-17]

---

[3]      Centers had put Byrd on hold to take another call from Officer Michael Caudill, which lasted from 1:35 to 3:50.  [Record No. 30-7]

[4]      Centers dated Byrd's niece when he was in high school, and he visited the Byrds' home "many times."  [Record No. 27, p. 36; 30-7, 5:05-5:10]

Following conversations with the officers, Mike and Geraldine Linkous provided written statements and were told to leave. [*See* Record Nos. 30-4; 30-5] However, when Byrd observed that the Linkouses were being allowed to leave, she came off the porch to object. [Record No. 27, p. 48] Bryant repeatedly reminded Byrd that she should not make threats in his presence. [Record No. 29, p. 23] But when Bryant would turn around, Mrs. Linkous would mouth threats and gesture obscenities at Byrd. [Record No. 27, pp. 47-48] Unfortunately, as the Linkouses were leaving, Byrd threatened to drag Mrs. Linkous out of her vehicle and strike her.[5] [*Id.* at p. 48] Bryant and the other officers eventually left the scene without making any arrests.

Bryant later reported the incident to the county attorney, who made the decision to file a criminal complaint against Byrd. [Record no. 29, pp. 23-24] Bryant provided an affidavit in support of the complaint, in which he stated that

> Sarah Byrd threatened to "stomp" Michael Linkous and would not calm herself down during the interviews of the witnesses despite being told by affiant that she was in danger of being charged for a crime (when she again came toward affiant shaking her finger and yelling at Michael Linkous). Affiant had to direct her several times to stay on the porch at her home while he talked with other witnesses. Defendant continued to be agitated and angry to the point she told affiant that there "would be blood shed" and when Michael Linkous and his wife began driving away (after the interview), Defendant yelled "bitch" and "I will drag you out of that car and stomp you." Defendant had also called into 911/dispatch and threaten[ed] to "shoot them." The affiant conformed [sic] that 911 call with dispatch and also witnessed/heard the other statements made by Defendant. Further investigation by affiant confirms the prior report of Denzel [sic] Linkous to the Wolfe County Sheriff's Office that Defendant had threatened to kill him if is [sic] was in the driveway again (the driveway that he owns a "right of way" for and which is next to Ms. Byrds [sic] residence).

---

[5]    Byrd could not recall the exact threat she made. She testified that she threatened to "whip" Mrs. Linkous, but Bryant reported that she threatened to "stomp" her. [Record Nos. 27, p. 48; 30-3, p. 1] When asked whether she used the word "stomp," Byrd indicated that she "may have used that word." [Record No. 27, p. 48]

[Record No. 30-3, p. 1]  Bryant served the warrant and arrested Byrd a few days after the incident (on June 25, 2018).  [*Id.* at p. 2]  She spent nearly twelve hours in jail before her husband posted her $5.00 bail.  [Record No. 28, p. 28]  The charges were dismissed with prejudice on August 15, 2018.  [Record No. 1-1, p. 6]

Byrd is convinced that she was arrested because the Linkouses are favored in Campton, and the community exists "for their own personal benefit."  [Record Nos. 27, p. 57; 1-1, p. 3 (asserting that Bryant's "subjective affection for the Linkous Family motivated him to maliciously bring" the charges)]  As noted, the Byrds moved back to Campton a short time before their dispute with the Linkouses began.  [Record No. 27, pp. 2-4]  Even after their return, Byrd remained Vice President of the Rotary Club of West Liberty, in Morgan County, and she attended church in Stanton, which is in another county to the west of Wolfe County.  [*Id.* at p. 8]  Byrd's husband worked over 50 miles away.  [Record No. 28, p. 13]

Within the law enforcement community, the Byrds were not as well-known as the Linkouses.  Bryant, a four-term elected official that considers himself a "friend to everybody" in Wolfe County, had "never seen [the Byrds] in [his] life until" the incident.  [Record No. 29, pp. 8-9]  When Caudill was dispatched, he asked Centers who the Linkouses were "into it with," and Centers responded that it was the Byrds, who were "from Morgan County."  [Record No. 30-7, 2:25-2:35]  Centers then reminded Caudill that "Denzil was madder than hell" at the Byrds a few days before, and it was the "same people . . . picking on Denzil's son now."  [*Id.* at 2:42-2:55]

Byrd alleges that Bryant "intentionally and falsely included" the statement "there would be bloodshed" in the affidavit, and that this statement "caused the charges to be brought and

the arrest to be issued." [Record No. 33, p. 5][6]  Byrd does not dispute that she threatened Mrs. Linkous in Bryant's presence, but she claims she never said there "would be bloodshed." [Record Nos. 27, p. 53; 33, p. 5]  She also alleges that, the day after the arrest, Bryant told Byrd's husband that he arrested Byrd because she "needed to cool off" and he wanted to "prove a point."  [Record No. 28, p. 28]

Byrd claims that, as a direct result of the arrest, she lost her job and "suffered extreme embarrassment, humiliation, and suffering."  [Record No. 1-1, p. 4]  Her picture was printed in the local newspaper and seen by friends, family, and coworkers.  [Record No. 27, p. 104]  Further, Byrd contends that her blood pressure and anxiety medication dosages had to be increased as she coped with the fallout from the incident.  [*Id.* at pp. 92-93]  The Byrds have again left Wolfe County.  [*Id.* at p. 3]  As a result of the foregoing actions, Byrd seeks compensatory and punitive damages.  [Record No. 1-1, p. 4]

## II.

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).  The operative inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

---

[6]     During her deposition, Byrd repeatedly denied that she ever told Centers that she had a gun or threatened to shoot anyone. [*See* Record Nos. 27, pp. 40 (testifying that she merely implied the presence of a weapon in her home); 43 (referring to Centers' report as "absolutely not true"); 46 ("No, I did not have a gun.  I wouldn't have told [Centers] that."); 71-72 (testifying that Centers must have "lied").]  Byrd's response to the current motion, filed after the disclosure of the 9-1-1 audio, instead focuses on whether she told Bryant there "would be bloodshed."  [Record No. 33, p. 2]

one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The moving party bears the initial burden to produce evidence that it is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 317; *see also Angelo v. Kroger Co.*, No. 86-3912, 1987 U.S. App. LEXIS 11965, at *24 (6th Cir. Sept. 3, 1987) ("The burden of production imposed by Rule 56 requires the moving party to make a prima facie showing that it is entitled to summary judgment.") (internal citations omitted)). This burden is met simply by showing that there is an absence of evidence on an issue which the nonmoving party has the ultimate burden of proof at trial. *Id.* at 325.

Once the moving party has met its burden of production, the burden shifts to the nonmoving party to come forward with "specific facts" that indicate there is a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2553; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). This burden requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Keeneland Ass'n, Inc. v. Earnes*, 830 F. Supp. 974, 984 (E.D. Ky. 1993) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmovant must "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir.1994) (citation omitted).

"The judge's function is not to weigh the evidence, but to decide whether there are genuine issues for trial." *Moses v. Baker*, 798 F. Supp. 2d 863, 865 (E.D. Ky. 2011) (citing *Anderson*, 477 U.S. at 249). "A fact is 'material' if the underlying substantive law identifies the fact as critical." *Estep*, 2020 WL 3270379, at *3 (citing *Anderson*, 477 U.S. at 248). If the burden shifts to the nonmovant, summary judgment is precluded only if a dispute exists over a fact that "might affect the outcome of the suit," not over facts that are "irrelevant or

unnecessary." *Anderson*, 477 U.S. at 248.  And an issue is "genuine" where the trier of fact could rationally resolve the issue in the nonmovant's favor.  *Matsushita Elec.*, 475 U.S. at 586-87.  Further, in deciding whether to grant summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws inferences in its favor.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

### III.

Byrd asserts claims against Bryant under federal and state law.  She sets out a "state law claim of malicious prosecution" as well a claim for "violations of her civil rights" under 42 U.S.C. § 1983.[7]  [Record No. 1-1, p. 4]  Byrd further argues that Bryant violated her "rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution." [*Id.*]

Section 1983 provides for a federal cause of action against a person who, acting under color of state law, "subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution."  42 U.S.C. § 1983.  A plaintiff asserting a § 1983 cause of action must show that the defendant is not entitled to qualified immunity.  "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly

---

[7]     In her response to the present motion, Byrd seemingly drops any claims made against Bryant in his official capacity as Wolfe County Constable.  Although her complaint specifically sought relief "against the Defendant in both his individual and official capacity," she now contends that none of her claims are "based on vicarious liability."  [Record No. 1-1, p. 5; 33, pp. 7-8]  But as Bryant correctly points out, "official capacity claims are in essence claims against Wolfe County."  [Record No. 30-1, p. 9]  And *respondeat superior* liability claims are generally barred under § 1983.  *See Adams v. Wechsler*, No. 0:18-CV-00102-HRW, 2020 WL 3714604, at *4 (E.D. Ky. July 6, 2020) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).  As such, Bryant is entitled to judgment as a matter of law to the extent that Byrd's claims are asserted against him in his official capacity.

established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Thus, to determine whether a defendant is entitled to qualified immunity, a court answers two questions: "First, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? Second, is the right clearly established?" *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). Although phrased sequentially, a court may answer the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

### a. Fifth, Sixth, and Fourteenth Amendment Claims

Bryant is entitled to summary judgment on these claims. He carried his burden by pointing to an absence of evidence for these claims, and Byrd's meager response[8] fails to create

---

[8]     The entirety of Byrd's response to Bryant's motion as it pertained to these claims is as follows:

> IV.B. The Plaintiff's Claims under the Fifth Amendment.
>     Likewise, the Defendant Frank Bryant violated the Fifth Amendment rights of the Plaintiff by subjecting her to an unnecessary prosecution and knowingly violating her rights.
>
> IV.C. The Plaintiff's Claims under the Sixth Amendment.
>     Likewise, the Defendant Frank Bryant violated the Sixth Amendment rights of the Plaintiff by subjecting her to an unnecessary prosecution and knowingly violating her rights.
>
> IV.B. The role of the Fourteenth Amendment.
>     The Fourteenth Amendment incorporates the Plaintiff's Fourth Amendment right to be free from arrest without probable cause against the Defendant as a state actor. To the extent the Defendant argues otherwise, he should be denied summary judgment.

[Record No. 33, p. 10]

a genuine issue for trial.  Byrd's claim under the Fifth Amendment seemingly relies on a violation of Due Process, but "the Fifth Amendment's Due Process Clause circumscribes only the actions of the federal government." *Scott v. Clay Cty., Tenn.*, 205 F.3d 867, 873 n. 8 (6th Cir. 2000); *see also Owens v. Trulock*, No. 1: 18-CV-00167-GNS, 2020 WL 376658, at *3 (W.D. Ky. Jan. 23, 2020).  The basis for Byrd's claim under the Sixth Amendment is even less clear, but such a claim requires "some allegation indicating an interference" with the attorney-client relationship such that the right to counsel was denied. *Stanley v. Vining*, 602 F.3d 767, 770 (6th Cir. 2010) (citing *Wolff v. McDonnell*, 418 U.S. 539, 576 (1974)).  Absent such allegations, there is no cognizable Sixth Amendment claim.  *Id.*  Regarding the Fourteenth Amendment, any claim Byrd may have properly asserted is duplicative.  *See Davis v. Gallagher*, 951 F.3d 743, 752 (6th Cir. 2020) (Malicious prosecution claims "should be pursued by way of the Fourth Amendment, not the Due Process Clause of the Fourteenth Amendment.").

These claims fail as a matter of law for another reason.  A party bringing a § 1983 action for an alleged violation of a specific constitutional provision is "forbid[den] . . . from duplicating th[eir] claims by repackaging them as" violations of other constitutional provisions.  *Davis*, 951 F.3d 743, 752 (6th Cir. 2020) (citing *United States v. Lanier*, 520 U.S. 259, 272 (1997)).  The pleadings, discovery, and arguments presented by the parties in this matter concern only Byrd's allegation of malicious prosecution, which is properly brought under the Fourth Amendment.  *See King v. Harwood*, 852 F.3d 568, 582 (6th Cir. 2017).  She has made no claim or elicited any facts that would plausibly support a cause of action under any other constitutional provision.  Therefore, these duplicative claims fail as a matter of law.

### b.    Malicious Prosecution Claims

"[I]ndividuals have a clearly established Fourth Amendment right to be free from malicious prosecution." *King*, 852 F.3d at 582–83. A malicious-prosecution claim under § 1983 requires that a plaintiff prove the following:

> First, the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute. Second, . . . the plaintiff must show that there was a lack of probable cause for the criminal prosecution. Third, the plaintiff must show that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty . . . apart from the initial seizure. Fourth, the criminal proceeding must have been resolved in the plaintiff's favor.

*Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010) (internal citations omitted).

Bryant argues that Byrd cannot show lack of probable cause. [Record No. 30-1, p. 13] Thus, because "any arrest without probable cause violates the Fourth Amendment," both Byrd's malicious-prosecution claim and Bryant's qualified-immunity defense turn on the same operative question: whether probable cause existed for her arrest. *Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir. 2003); *see also Barnes v. Wright*, 449 F.3d 709, 717 (6th Cir. 2006). "For probable cause to arrest to exist, the 'facts and circumstances within the officer's knowledge [must be] sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense.'" *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003) (quoting *Crockett*, 316 F.3d at 580) (alteration in original). If the objective facts, viewed in the nonmovant's favor, show that there was a "fair probability" that the defendant committed or intended to commit a crime, then probable cause existed. *Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir. 2001). When "there is only one reasonable determination that is possible" from the record, the probable-cause question need not be submitted to a jury.

- 13 -

*Thacker*, 328 F.3d at 255.  "Common sense is not to be ignored."  *Hall v. Brammel*, No. CV 18-85-DLB, 2019 WL 6135040, at *3 (E.D. Ky. Nov. 19, 2019) (citing *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

Byrd was arrested for terroristic threatening in the third degree.  Kentucky Revised Statutes § 508.080 states that a person commits the offense when "[s]he threatens to commit any crime likely to result in death or serious physical injury to another person."  As noted, Bryant provided an affidavit in support of the criminal complaint, in which he reported that Byrd made three threats in his presence.  [Record No. 30-3]  He reported that Byrd threatened to "stomp" both Mike and Geraldine Linkous, and that she warned Bryant that there "would be bloodshed."  [*Id.*]  Bryant also reported that he was aware that Byrd had threatened to shoot the Linkouses when she called 9-1-1.  [*Id.*]

Even when viewed in the light most favorable to Byrd, the facts lead to the inescapable conclusion that Bryant had probable cause to arrest Byrd for terroristic threatening.  It is undisputed that Byrd threatened to shoot the Linkouses more than one time, and those threats prompted Centers to dispatch Bryant.  [*See* Record No. 30-7; 30-5]  Bryant was aware of these threats and of the prior disputes between Byrd and the Linkouses.  [Record No. 30-3]  Further, Byrd continued to make threats in Bryant's presence.  [Record No. 27, p. 48]  These threats, whether to shoot or physically strike the Linkouses, plainly fall within the proscribed conduct of § 508.080.  *See, e.g., Juillerat v. Mudd*, 735 F. App'x 887, 890 (6th Cir. 2018).  As such, "[b]ecause undisputed facts known to [Bryant] justified a reasonable belief that [Byrd] was violating (or did violate) KRS [508.080] on the evening in question—and, in the Court's view, no juror could rationally conclude otherwise—[Bryant] is entitled to summary judgment on the [malicious prosecution] claim."  *Estep*, 2020 WL 3270379, at *5.

- 14 -

Byrd's state-law claim fails for the same reason. Under Kentucky law, "[m]alice and want of probable cause are the essentials in an action for malicious prosecution." *Roberts v. Thomas*, 121 S.W. 961, 962 (1909); *see Martin v. O'Daniel*, 507 S.W.3d 1, 11–12 (Ky. 2016). "[W]here there is a specific finding of probable cause in the underlying criminal action," a plaintiff cannot prove the elements of malicious prosecution. *Broaddus v. Campbell*, 911 S.W.2d 281, 283 (Ky. Ct. App. 1995). Therefore, Bryant is entitled to summary judgment on the state law claim.

Byrd's claim that she did not make one of the threats mentioned in the affidavit—that there "would be bloodshed"—is unavailing. Assuming Byrd's version of events is more accurate than Bryant's (as the Court must do at this stage), Bryant would have still had probable cause to arrest her. "If the facts known to the officers support probable cause in any form, then an individual may lawfully be arrested." *Howse v. Hodous*, 953 F.3d 402, 409 (6th Cir. 2020). And the Court has already found that Byrd's admitted threats supported probable cause to arrest her, with or without the additional claim of violence. As such, the dispute over this fact is not material to the outcome of Byrd's claims,[9] and it does not preclude summary judgment.

---

[9]     It is also worth pointing out that the allegedly false statement would be a natural consequence of Byrd's other threats, had she followed through on them. Thus, even if Bryant had included only the disputed statement in the affidavit, it may not have precluded summary judgment in his favor. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law.") (internal quotation omitted).

Byrd makes a number of other unpersuasive arguments.  First, she asserts that she "made her comments in self-defense" and Bryant either intentionally omitted that fact from the affidavit or was recklessly blind to it.  [Record No. 33, p. 3]  But self-defense is just that: a defense.  It may very well be, as Byrd argues, a "complete defense to the charge" of terroristic threatening.  [Record No. 33, p. 4]  But the *charge* against Byrd has been dropped, and her current claim centers on whether probable cause supported her *arrest*.

For the same reason, the alleged dispute over whether Bryant intentionally omitted the "context in which [Byrd] made her statements" is not a genuine dispute that precludes summary judgment.  [*Id.* at p. 3]  According to Byrd, this context would have shown that she was defending herself and her property from trespassing neighbors threatening violence.  But again, probable cause is an objective inquiry, and the objective, undisputed facts indicate that Byrd, not the Linkouses, made threats in Bryant's presence.  The only alleged threats made by the Linkouses in Bryant's presence were "mouth[ed]," gestured, or made when "his head was turned."  [Record No. 27, pp. 47-48]  Whatever threat may have been made, Byrd testified that "[Bryant] didn't hear it."  [*Id.*]  And Byrd does not dispute that the Linkouses were on the driveway when Bryant was on the scene.[10]  [Record No. 29, p. 11]  Under the circumstances as Byrd presented them, Bryant would have been unaware of the Linkouses' threats and did not witness any trespassing.  Thus, there is no genuine dispute over whether Bryant

---

[10]     In fact, an immaterial but genuine dispute exists over whether the Linkouses ever left the right of way to begin with.  The Linkouses' written statements dispute that they set foot off the driveway.  [*See* Record Nos. 30-4; 30-5.]  And in Byrd's call to 9-1-1, she told Centers that the Linkouses were "taking full advantage of" the right of way.  [Record No. 30-7, 2 at 1:00-1:30]  Although she testified that Mike Linkous was "exploring the yard" and "looking in the truck bed," assuming this refers to the same broken-down truck the Byrd's moved from the right of way, it was likely not very far off the driveway.  [Record No. 27, p. 30]  In any event, this dispute is immaterial to the disposition of the present motion.

intentionally omitted information of which Byrd was unaware.  *See also Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("mak[ing] clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause").

Finally, Byrd argues that a fact question remains regarding whether Bryant acted maliciously.  But as noted, a claim of malicious prosecution under Kentucky law requires a plaintiff to prove malice.  *See Martin*, 507 S.W.3d at 11–12.  Byrd argues that Bryant's statement to her husband that he arrested her to "prove a point" proves the malice requirement.  [Record No. 33, p. 7]  She also testified that she believes she was arrested because the Linkouses receive special treatment in Campton.  [Record No. 27, p. 58]  "[I]n the criminal context, [malice] means seeking to achieve a purpose other than bringing an offender to justice."  *Martin*, 507 S.W.3d at 11.

Byrd has provided facts and arguments suggesting that the law-enforcement community favored the Linkouses in this dispute.  Notably, the exchange between Caudill and Centers indicates that the officers were biased toward the Linkouses.  [Record No. 30-7, 2 at 2:25-2:55]  And when Bryant was on the scene, he chose to get in Denzil Linkous's vehicle and assess the situation.  [Record No, 29, p. 13]  Further, Bryant knew the Linkouses, and he was previously granted permission to hunt on their property.[11]  [Record Nos. 29, p. 8; 28, p. 19]  Further, the Court assumes for the sake of the current motion that Bryant told Byrd's husband that he arrested her to "prove a point."

---

[11]      Byrd provides this fact to show that Bryant had a close relationship with the Linkouses, but the record does not support that claim.  For one thing, Byrd acknowledged that the Linkouses stopped allowing people to hunt on their property, which her husband testified happened "15 or 20 years ago."  [Record Nos. 27, p. 78; 28, p. 20]  And after the Linkouses stopped allowing people from the community to hunt on their land, only Byrd's husband was allowed to continue doing so.  [Record No. 28, p. 20]

But malice is only one of the two "essentials" in a malicious prosecution action. *Roberts*, 121 S.W. at 962. Kentucky law requires both a lack of probable cause *and* malice to make out a claim for malicious prosecution. Byrd was required to create a genuine dispute of material fact regarding both elements, but she failed to do so.

**IV.**

Bryant had reason to believe that Byrd committed a crime by threatening to batter the Linkouses in his presence. He relayed those reasons to the county attorney, who previously had been pulled into the parties' dispute. And based on the threats of violence lodged by Byrd, the dispute had escalated to the point that someone was going to get hurt if they did not do something. [Record No. 29, p. 24] Byrd argues that necessary additional context was intentionally concealed. She contends that this context would have shown that her threats were justified, and that only a biased officer would think otherwise. But under the circumstances as she presents them, probable cause existed for her arrest, and Byrd has pointed to no genuine disputes of material fact that could lead a jury to find otherwise.

Accordingly, it is hereby

**ORDERED** that the defendant's motion for summary judgment [Record No. 30] is **GRANTED**.

Dated: September 30, 2020.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky